Sociedad Protectora de Niños, Appellant, *v.* Registrar of
San Juan, Respondent.

Appeal from a Decision of the Registrar of Property
Refusing to Record Construction Titles.

No. 469.—Decided July 28, 1921.

Record of Title—Conjugal Partnership—Separate Property—Curable De-
fect.—The title to a lot with a house and garage thereon, purchased from
a divorced woman who acquired the lot before her marriage and constructed
the house and garage thereon during wedlock with her separate funds, as
stated by her and corroborated by her husband, is recordable in the registry
of property, and failure to submit better evidence to the registrar on that
point does not prevent the recording of the constructions, for it is a curable
defect according to repeated decisions of this court.

Id.—Id.—Id.—A contract leasing the said lot with a house and garage thereon,
made by the same woman during wedlock, having been previously recorded
in the registry with the curable defect of lack of evidence that the house
and garage were her separate property, the registrar must respect that deci-
sion and cannot ignore it in refusing to record the sale of the house and
garage.

Id.—Id.—If a lot with a house erected thereon was acquired by title of purchase
and the sale of the lot was recorded without mentioning the house, a sale
of the house and lot can not be recorded in the registry with regard to the
house, because it is not recorded in the name of the predecessor in title.

The facts are stated in the opinion.

*Messrs. Soto Gras & Siaca* for the appellant.

The respondent appeared by brief.

Mr. Justice Hutchison delivered the opinion of the court.

María Palomo Mellado, already a property owner, on
September 18, 1918, shortly before her marriage, bought and
became the record owner of a dilapidated house and a lot.
In a lease executed on April 15, 1919, and duly recorded on
the 30th of the same month, a small house and garage, valued
together at $1,500, are described as standing on the site
formerly occupied by the old house above mentioned and
are said to have been acquired by the lessor and above men-
tioned owner of the lot in question, now a married woman,
through rebuilding and construction at her own expense and
with her own separate funds, to wit, a part of the money

brought by her in cash to the marriage as shown by the antenuptial agreement. The desire and purpose of the lessor, and of her husband, to have the house and garage appear upon the record as her separate property plainly appear from the record entry, which was in part as follows:

"House and lot situated in the ward of Hato Rey of the Municipality of Río Piedras. The building, which is a one-story frame house covered with zinc, with an adjoining garage having compartments for two cars, has been recently erected on the said lot on the same site formerly occupied by a one-story frame house covered with zinc which was demolished on account of its ruinous condition.

    *        *        *        *        *        *        *

"María Palomo Mellado, of age, unmarried, property owner and a resident of Río Piedras, acquired the lot while unmarried by purchase from Julián Silva Hubradón, according to the tenth record, it being also stated in the document that the house now situated on the lot, and the adjoining garage, were partly rebuilt and partly built anew by María Palomo y Mellado while married to Julio Rodríguez y Bonilla, at her own expense and with her separate funds, being a part of the money brought by her in cash to her marriage to Rodríguez, as appears from the antenuptial agreement entered into by both spouses, María Palomo desiring and consenting that such buildings, the said house and garage, be recorded in the registry of property as acquired through rebuilding and construction at her expense and with her own separate funds, stating, to that effect, that the house and garage are worth one thousand and five hundred dollars.

"And by the present document María Palomo y Mellado, of age, property owner and a resident of Río Piedras, leases the property of this number, as consisting of the said lot with the buildings described, together with another property recorded as indicated by the marginal note, to Frederick B. Noonan, of age, divorced, an architect and a resident of this city, for a period of five years from the date of the deed to the 14th of April, 1924.

    *        *        *        *        *        *        *

"Julio Rodríguez y Bonilla, of age, property owner and a resident of Río Piedras, ratifies the above statements with regard to the construction and rebuilding of the house and garage, which his wife, María Palomo, may sell, alienate, encumber, mortgage, assign, ex-

change, lease, or in any other manner subject to her own acts as exclusive and independent owner, without the intervention of the said Rodríguez who, for the sake of explicitness, expresses his consent to the present lease in so far as the said buildings are concerned, and to all that his said wife, María Palomo, has agreed upon or executed herein.

"By virtue thereof I hereby record in the name of Frederick B. Noonan his right as lessee of the property of this number, with the curable defect of failure to establish the source of the money expended in rebuilding the house and constructing the garage."

Conceding for the sake of argument the existence of the curable defect so indicated, the record of this lease, as made, was proper and would have been affirmed by this court on appeal, even though the instrument had been an absolute deed of conveyance executed by the wife without the appearance, ratification or express consent of the husband. *Figueroa* v. *Registrar of Arecibo,* 24 P. R. R. 793; *Godreau & Co.* v. *Registrar,* 23 P. R. R. 61, and *Rodríguez* v. *Registrar,* 26 P. R. R. 67. And that subsequent transfers of the property so conveyed would have been eligible to record, subject only to the mention of such curable defects, is hardly open to argument.

If, as would seem to be the fact, save for mention of the curable defect, the registrar had before him the marriage contract, and if, as stated in the agreement of lease, the wife brought to the marriage in cash a sum equal to or greater than the value of the house and garage as shown by such marriage contract, then there was no curable defect, and had an appeal been taken the ruling in this regard would have been reversed. The registrar does not say that the marriage contract was not presented. But, if the meaning of the entry be that the marriage contract was not copied in full in the notarial instrument presented for record, nor otherwise produced, then the registrar was not bound by the mere recital in question and the mention of such failure to produce documentary evidence of the fact as a curable

defect was proper within the doctrine of *Cobreros et al.* v. *Registrar of San Juan, ante,* page 537, and cases cited. In any event it was but a curable defect susceptible of correction at any time by production of the marriage contract.

In April, 1920, María Palomo, now divorced, conveyed the house, garage and lot above mentioned, together with other real estate, to La Sociedad Protectora de Niños. This deed was admitted to record as to the land, but "refused admission to record as to the buildings, for the following reasons: As regards the house and garage of property letter 'A', because they having been acquired by the vendor while married to Julio Rodríguez Bonilla, she conveys them, after her divorce, without showing that the community has been liquidated or that they have been allotted to the vendor; and as regards the house measuring eleven by seventeen meters, of property letter 'B', because the purchase allegedly made thereof by the vendor was not recorded in her name."

La Sociedad Protectora de Niños appeals from this ruling.

Thus far, in order to avoid confusion, we have omitted all details in regard to the property referred to by the registrar as letter "B", and for the same reason the second point involved may be put out of view until the first is disposed of.

In support of this first proposition the registrar cites a number of cases in which this court has held that as to third persons entitled to the benefit of the legal presumption established by section 1322 of the Civil Code, the mere statement made by both spouses in a conveyance of real estate to the wife as to the separate character of the purchase money is not enough to destroy such presumption. In none of these cases did it conclusively appear that the wife had any separate property whatsoever of her own at the time of the marriage. In none of them were the statements as to the source and separate character of the purchase price made within less than seven months after marriage. In none of

them was an antenuptial contract referred to as evidence
of the truth of such statements. In none of them was there
any question raised or necessarily involved as to the effect
of such statements by way of estoppel or otherwise as be-
tween the parties to the contract and their privies or other
persons relying in good faith upon such statements in deal-
ing with the property. In fact, in the latest of the cases
referred to—*Sánchez* v. *Registrar,* 28 P. R. R. 624—the opin-
ion expressly disclaims any purpose to pass upon the scope
or effect of the recitals there under consideration beyond
the conclusion announced as to the survival of the presump-
tion in regard to the community character of property con-
veyed to and recorded in the name of the wife, notwithstand-
ing the bare statement of the spouses and of the wife's father
as to the source of the purchase money.

"In the Spanish system, side by side with community property
runs the separate estate of each spouse; separate property and com-
munity property are the complements of each other; each spouse
may have a separate estate; not separate in the common law sense,
but separate from the common fund of matrimonial gains. The
husband managed the wife's, as well as his own, separate property,
and the fruits of all separate property went into the common fund.
The Spanish idea of separate property has suffered many changes
in the United States. First came a radical change when California
diverted the fruits of separate property from the common fund to
the separate estate; this modification was followed in Arizona, Ne-
vada and Washington. With the diversion of the fruits of separate
property from the common fund came also another change, viz.:
Taking from the husband and giving to the wife the management
of her separate property. In fact the modern movement freeing
the wife's separate property from the husband's power of manage-
ment, and enlarging the wife's power has made such headway that
now in Arizona, California, Nevada and Washington the wife has
all the powers of a *feme sole* to enter into contracts and to manage
and convey her separate property without the husband's assent or
joinder.

"Texas has adhered more closely to the Spanish Law in reference

to the management, and the fruits and revenues, of the wife's separate property than any other state; there the fruits of separate property go into the common fund and the husband has the management of the wife's separate property.

"Louisiana has departed from the rule of the Spanish Law, and permits the wife to take into her sole control that part of her separate property classified as paraphernal, and when she does so, she takes as paraphernal the rents, issues and profits. Her dotal property remains under the husband's management and control and its fruits and revenues go into the common fund." McKay on Community Property, page 39, section 5.

"As to the *existence* of the presumption (that all property found in the name or hands of either spouse after marriage is common), there is no dissent; but there is some apparent difference of opinion as to the force of the presumption and the *quantum* of proof necessary to overcome it and show a separate acquisition. In most cases these apparent differences may be reconciled by taking into account the special circumstances of the cases wherein the apparently divergent opinions were rendered.

"The presumption has little force immediately after the celebration of the marriage, and especially before the parties have turned from their nuptials to the business affairs of life; but it gathers force as we recede from the date of the marriage, and after time has elapsed for the acquisition of property; after property has been acquired, and the original separate holding has been changed and exchanged for other property, and commingled with the acquisitions of the common fund, proof of separate ownership is difficult to make; and to trace the original separate property through its mutations and exchanges becomes, at times, well nigh impossible; under such circumstances it is sometimes said the presumption is strong, when what is really meant is, that the counter proof is weak, uncertain, and unreliable, and therefore insufficient.

"The presumption is not so strong as to property acquired in the name of the wife; to take property in the name of the wife, is out of the usual course of transacting the business of the marital partnership, and when it is done, it *points* toward her separate acquisition, and is *slight* proof tending to show that the property is her separate property, but not of itself sufficient; now when it is said that the presumption as to acquisitions in her name is not so strong, what is meant is that the fact of acquisition in her name

is *some* evidence of a separate acquisition, though not enough unless supplemented by *further* proof; the circumstances of the transaction furnish *some* proof, though slight, that the property is separate, and the force of the legal presumption is lessened accordingly. The presumption is not arbitrary, but reasonable, and moulds itself to all the varying circumstances attending the holding and acquisition of property, and permits full effect to be given to those circumstances." *Id.,* p. 324, sec. 261.

"The reasoning of the previous sections leads to the conclusion that proof of separate ownership reasonably certain in view of the circumstances, is all the law requires. Proof beyond a reasonable doubt, as in criminal cases, is not required, and indeed in actual practice, degrees of proof mean very little. Evidence operates upon different minds with different degrees of force, and what is strong proof to one is proof of a lower degree to another. Proof to a reasonable certainty, means such proof as would so convince the mind of the ordinary practical every-day man that he would be willing to act upon it in the business affairs of life. This is all that the later well considered opinions require." *Id.,* p. 325, sec. 262.

"Where the conveyance to the wife limits the estate conveyed, to her separate use, or contains recitals showing that the consideration proceeded from her separate estate, *and it appears from the conveyance itself* that the husband assented to the *form* of the conveyance then, in the author's opinion, it should be held that the wife takes a separate estate, subject however to be overthrown by third persons; the wife's right to a separate estate in such a case rests on no more secure foundation than the assent of the husband, and if this assent be given in violation of the rights of others, they should not be prejudiced." *Id.,* p. 178, sec. 92.

"In Louisiana the recitals in the act of sale (the deed) conveying property to the wife, are binding on the husband because he is in law a necessary party to the conveyance; without his consent she can not purchase; in this state the force of the recitals as evidence is put upon the clear and rational ground that they amount to admissions against his interest, as master and manager of the community; and in accord with this reason, they are not evidence against third persons generally among whom are enumerated the husband's creditors, and his forced heirs, as to their legitimé. The cases in Louisiana reinforce the reasoning of the preceding section

as to such recitals in deeds to the wife where the husband has the management and control of her property; they also show the just limits of the doctrine and the reason upon which the rule rests.

"The recitals are declarations or admissions by the husband against his interest and are therefore *evidence* against him, but not *conclusive*, for he may show that they were inserted by fraud or mistake. In accord with this reasoning, the recitals in the conveyance to the husband are not evidence, at all, in his favor." *Id.*, p. 340, sec. 278.

Sections 173, 174 and 176 of the Civil Code read as follows:

"Sec. 173.—A divorce carries with it a complete dissolution of the matrimonial ties, and the division of all property and effects between the parties to the marriage.

"Sec. 174.—The party against whom the judgment is rendered shall forfeit to the party obtaining the divorce all gifts which the other party may have conferred upon such party during the marriage, or when the same was contracted, and the innocent party shall retain everything which has been acquired from the other.

"Sec. 176.—The divorce of the parents will not deprive the children born during the marriage of the rights and privileges which, according to law, belong to them, by reason of the marriage of their parents; but such rights shall not be claimed except in the form and under the circumstances in which such claims would have been made if a divorce had not taken place."

Section 1330 provides that "The community of goods terminates when the marriage is dissolved in the cases indicated in this Code or is declared null."

Given the fact, without more, that a divorce has been granted, the presumption, if any, even in the absence of the section last above mentioned, would seem to be, not that the character of community property is in no wise affected by such decree, but that as to all such property the husband and wife *ipso facto* become and are tenants in common.

"Although in the states where the institution of community property of husband and wife exists, there is usually a statutory

provision for its division in connection with the divorce proceedings, the general rule is that, where community property is not referred to in the decree of divorce, the parties become as to such property tenants in common. Godey v. Godey, 39 Cal. 164; Biggi v. Biggi, 98 Cal. 35, 35 Am. St. Rep. 141, 32 Pac. 803; Kirschner v. Dietrich, 10 Cal. 502, 42 Pac. 1064; Tabler v. Peverill, (Cal. App.) 88 Pac. 994; Kirkwood v. Domnau, 80 Tex. 645, 26 Am. St. Rep. 770, 16 S. W. 428; Southwestern Mfg. Co. v. Swan, (Tex. Civ. App.) 43 S. W. 813; Moor v. Moor, 24 Tex. Civ. App. 150, 57 S. W. 992; Williamson v. Gore, (Tex. Civ. App.) 73 S. W. 563.

"In Whetstone v. Coffey, 48 Tex. 269, it was contended that the statute prescribing that 'the court pronouncing a decree of divorce from the bonds of matrimony shall also decree and order a division of the estate of the parties in such way as to them shall seem just and right, having due regard to the rights of each party and their children, if any: Provided, however, that nothing herein contained shall be construed to compel either party to devest him or herself of the title to real estate or to slaves, had the effect to make the decree of divorce res judicata as to the property rights of his wife, although the right to the property was not brought in question in the suit of divorce, so as to preclude a subsequent action by the wife for her part of the community property. The court held, however, that such was not the effect to be given to the statute, saying: 'This certainly secures to either party the right to file such pleadings as will inform the court of the character and extent of the property to be partitioned, and may empower the court to require it to be done, especially in the interest of the children, if there should be any. But suppose the parties do not ask it, and the court does not require it to be done. Could it have been contemplated by the Legislature, in the enactment of this law, that the failure to do it would produce, by implication, the very result which they expressly prohibited the court from doing,—which is, or may be to devest the wife of her title to the whole of the community property left in the hands of the husband? Such a result could hardly have been anticipated.' * * *

"That in Porto Rico a divorced wife is deemed to have an interest in community property, although the decree of divorce makes no provision therefor, seems to be recognized in Garrozi v. Dastas, 204 U. S. 64, 51 L. ed. 369, 27 Sup. Ct. Rep. 224, in which a divorced wife was permitted to maintain an action to set aside simu-

lated transfers of the community property by her husband.'' 11 L. R. A. (N. S.) 103, Note to *Ambrose* v. *Moore*.

Neither section 174, nor section 1301, nor section 1322, nor any other section of our Civil Code provides that representations or admissions against interest made by the husband in regard to the separate character of property acquired by the wife are presumed to be false, or that a conveyance containing such representations and recitals and transferring real estate from a third person to the wife is presumed to mask a gift from the husband.

''The terms 'inference,' 'probability,' 'assumption' and 'presumption' have substantially the same meaning and import as they are used in legal writings and opinions. Attempts have been made from time to time to draw distinctions between certain of these terms but legal as well as common parlance recognizes no such refinements of meaning.'' 10 R. C. L., p. 867, sec. 10.

''It not infrequently occurs that the same facts give rise to two presumptions, and that these presumptions are in conflict one with the other. In this situation one of the presumptions must give way. Their strength should be measured and the weaker should be deemed to be overcome by the stronger. Each case will be controlled, of course, by its own facts.'' *Idem*, p. 869, sec. 12.

''It is a well established rule that a presumption can be legally indulged only when the facts from which the presumption arises are proved by direct evidence, and that one presumption can not be deduced from another. To hold that a fact inferred or presumed at once becomes an established fact, for the purpose of serving as a base for a further inference or presumption, would be to spin out the chain of presumption into the regions of barest conjecture.'' *Idem*, p. 870, sec. 13.

''An inference of fact should not be drawn from premises which are uncertain, but the facts upon which an inference may legitimately rest must, it is said, be established by direct evidence as if they were the very facts in issue. It follows that one presumption can not be based on another presumption.'' 22 C. J., p. 84, sec. 27.

A conveyance of real estate to a married woman as her separate property, with the express consent of her husband

to such form of conveyance and containing other data indicative of the actual source of the purchase price, although not of such probative force as wholly to destroy the legal presumption as to the common character of the property so conveyed to the prejudice of the rights of third persons, may be recorded in this Island as what it purports to be, with a proper caution as to the defective features of the showing so made. The fact that such property is claimed by the wife as her own and admitted by the husband to belong exclusively to her is thus published to the world; and mention of the circumstance that such showing is incomplete is an effective warning to any prospective purchaser, mortgagee or other person dealing with the property that the legal presumption as to its community character has not been wholly destroyed and may be invoked by any one entitled to the benefit thereof.

Had the registrar in the instant case recorded the deed subject to the same curable defect mentioned in the previous entry as to the sufficiency of the showing made in regard to the separate character of the property, basing his mention of such defect either upon such prior entry or upon the failure to produce with the deed the antenuptial agreement, then at least the doctrine of the decision by the General Directorate of January 17, 1913, referred to in the *Sánchez Case,* might have been said with some degree of plausibility to be applicable; but the ruling now before us is not based upon any such ground.

In construing matters of this kind it is well not to lose sight of certain alterations that have been made in our Civil Code and Mortgage Law during recent years, nor to ignore the spirit and the purpose of such modifications.

"The provisions of article 61 of the Spanish Civil Code, which was in force in this Island, that without the permission or power of her husband a married woman could not acquire property for a good or valuable consideration, or alienate her property or bind herself,

except in the cases and with the limitations established by law, was suppressed upon the adoption of the revised Civil Code in 1902." *Longpré* v. *Registrar of San Juan*, 24 P. R. R. 835; *Jiménez* v. *Registrar of Property*, 21 P. R. R. 314.

This article as it stood until stricken from the Code in the revision of 1902, was as follows:

"Art. 61.—Neither may the wife, without the permission or power of her husband acquire property for a good or valuable consideration, alienate her property or bind herself, except in the cases and with the limitations established by law."

In lieu thereof the new Code last above mentioned contained the following provisions:

"Sec. 160.—Each one of the parties to a marriage is the owner and administrator of his own property.

"Sec. 161.—The husband is the legal representative of the conjugal community.

"The wife may contract, and appear in court, in all cases referring to the defense of her own rights and property, to the discharge of the patria potestas, guardianship or administration conferred on her by the law and to the exercise of a .profession, employment or occupation."

And by an Act of March 10, 1904, section 160 was amended to read thus:

"The husband and wife shall have the right to manage and freely dispose of their respective separate estates." Compiled Statutes, page 609.

March 1st next will be the twentieth anniversary of "An Act to provide for appeals against the decisions of registrars of property," Compilation of 1911, page 425, repealing "General Order numbered ninety-nine of April 30, 1900, and all articles of the Mortgage Law and the Regulations for the execution thereof or parts of the same in conflict" therewith.

Section 4 of that Act reads as follows:

"Informal defects, if capable of correction, shall not constitute a legal ground for refusing to record or to enter any document presented which constitutes a muniment of title or constitutes or removes a charge against real estate. The record of any such document shall contain a reference to the defects in it and if, at any subsequent time, a document be presented for the purpose of curing the defects existing in the previous document, it shall be recorded and a marginal note of the correction of the defect shall be made on the record or entry of the first document."

Commenting upon this section in *Rodríguez* v. *Registrar*, 26 P. R. R. 66, we said:

"In the recent case of *Agostini* v. *Registrar*, this court affirmed a ruling in which the registrar held that the power of attorney submitted to him with a view to curing the defect in question was itself defective and insufficient for the purpose indicated, in that the same did not clearly identify the property, description of which was attempted therein.

"The present appeal is from an endorsement refusing admission to a conveyance executed by the record owner of the property, 'because having refused correction of the defect mentioned in the 8th inscription of the property in question, that is, the entry whereby the vendor acquired the property conveyed to the vendee, by reason of the insufficiency of the power of attorney executed by the predecessor in interest of Mrs. Agostini, unrectified by the affidavit attached thereto, as shown by the marginal note to said inscription, the acquisition by the vendor, Mrs. Agostini, is vitiated by a fatal defect which incapacitated her to transfer in turn the same property.'

"In the *Estate of Blanco* v. *Registrar*, 16 P. R. R. 64, upon presentation of certified copies of a judgment and order, certain entries were cancelled, subject to the curable defect that it did not appear that the judgment ordering such cancellation had become final. Correction of this defect was afterwards refused because the certificate showing that the judgment had become final also showed that it was not in fact final at the time of the entry made in pursuance thereof, and so, in the opinion of the registrar, rendered null and void the cancellation upon the record. This court then held that the legal status created by entries once made must be respected until modified in some manner known to the law; that the registrar should

have confined himself to a determination of whether or not the effect of the document presented to his consideration was to cure the defect noted on the record, and that the attempt to pass upon the validity of another instrument already recorded constituted an invasion of the exclusive province of the courts. That decision was based upon an express statutory provision, still in force, quoted in full in the opinion.

"In the case at bar appellant and all the world are informed by the registry not only that the record title of the vendor is subject to a curable defect but also that an attempt to cure the same has failed. The validity of that title, as shown by the power of attorney involved in *Agostini* v. *Registrar* and by the entry of record in regard thereto, depends upon a question of identity of certain property, sale of which by an attorney in fact was authorized, and not upon a question of capacity of the attorney in fact to convey, as argued by the registrar. The defect may be cured at any time by public instrument showing that the house, description of which is attempted in the power of attorney, is the same house sold by the attorney in fact and now after resale sought to be recorded in the name of appellant. Notice to all persons dealing with the property that the fact may be otherwise and that the matter is at least open to doubt would seem to be enough. It is quite conceivable that just such cases as the present, where all parties concerned apparently know the facts and prefer that a technical flaw in the record title should remain rather than go to the trouble and expense of correcting it at once, were in the mind of the Legislature when, in order to save unnecessary inconvenience, hardship and delay, it ordained that defects capable of correction 'shall not constitute a legal ground for refusing to record or to enter any document presented which constitutes a muniment of title or constitutes or removes a charge against real estate,' and that "the record of any such document shall contain a reference to the defects in it, and if at any subsequent time a document be presented for the purpose of curing the defects existing in the previous document it shall be recorded and a marginal note of the correction of the defect shall be made on the record or entry of the first document.' "

In *Schroeder* v. *Registrar,* 28 P. R. R. 175, on appeal from a refusal to record a mortgage executed by a married woman with the approval and ratification of her action by the hus-

band upon lands conveyed to her as her private property and recorded "subject to a curable defect for want of a sufficient showing as to the source of the purchase money," we reversed the ruling complained of for reasons stated as follows:

"The legal presumption as to the community character of the property involved herein, so long as the defect mentioned on the record is not cured, does not require that the spouses misrepresent the facts in dealing with the said property, pending a final determination of the status thereof in the registry. Both husband and wife seem to regard the house as the separate property of the wife; but, apparently in order to anticipate any objection by the registrar and to facilitate the record of the mortgage executed by the wife, the husband expressly ratifies and approves the same. In the circumstances it would be difficult to choose words more adequate to voice the 'mutual consent of both parties to the marriage' required by the Civil Code as a requisite to the alienation or incumbrance of community property. The Code does not prescribe the phraseology in which such consent shall be expressed, and ratification and approval, if they involve anything beyond a distinction without a difference, would seem to imply something more than mere consent."

And in *Negroni* v. *Lucchetti*, 24 P. R. R. 20, at page 22 we find the following:

"In various other documents made about the same time the said husband consented to his said wife contracting in her own name to effect the mortgage on said land. It is true, as the appellant alleges, that in all these transactions it was assumed that the property was the separate property of the wife, but we think that the husband was absolutely bound by them. Whether his act of consenting to these transfers was a ratification of the act of his wife, or whether he was estopped to set up any title by reason of his acts, the result is exactly the same. Even if the property were ganancial and he was consenting to its transfer in the erroneous belief that it was the separate property of the wife, it could make no difference. He was presumed to know the law."

Viewed in the light of the historical sketch, *supra,* outlining the development of the community system in the United

States, and considered in connection with the trend of events in this part of the world during the last two decades, there is nothing abstruse or recondite either in the phraseology or in the general scope and effect of the legislative enactments above mentioned, notwithstanding the sweeping character of the changes so wrought in our Civil Code and of the limitations thus placed upon the somewhat more than quasi judicial powers exercised by registrars of property prior to the change of sovereignty. A married woman in Porto Rico to-day has the absolute right to manage, to control and, at will, to dispose of her separate property without any interference, intervention or hindrance on the part of her husband or of the registrar of property.

In the case at bar the vendor of the buildings and lot acquired by appellant appeared from the record to be the owner thereof as separate property, subject only to a curable defect in the record title to the house and garage. Any prospective purchaser, on examination of the record, would know that the forced heirs or any third person entitled to invoke the presumption as to the community character of these buildings might assert a lawful claim thereto at any time. If in possession of the marriage contract, he might know also that the curable defect in question does not in fact exist, and that the mention thereof in the registry could be erased whenever desired by presentation of such marriage agreement and payment of the necessary fees. In any event, he would know that, as against him or any third person dealing with the property, the husband by his own admissions against interest, and by his conduct, act and deed in consenting to the placing of such admissions upon record in the registry of property, would be estopped to assert any right, title or interest in or to the property so proclaimed to be the separate property of the wife.

If a purchaser in such circumstances chooses to take the risk involved, including the possibility of valid outstanding

claims arising out of any decree of partition that might or might not follow the divorce proceedings, and if the rights of forced heirs and all other parties concerned are amply protected and secured by the mention of the alleged curable defect, then no possible injustice could result to anyone and the ultimate fact as to the true character of the property in question is a matter in which the registrar of property has no concern. The most that he could do would be to call attention to the curable defect already noted and to the failure to cure the same by presenting, together with the deed, a copy of the marriage contract or other sufficient evidence of the truth of the recitals contained in the deed. More than this is expressly prohibited by section 4 of the Law of March 1, 1902, and to hold otherwise would operate, *pro tanto,* a judicial repeal of that plain expression of the legislative will.

It seems that the house standing upon the property referred to in the entry as letter "B" was acquired by purchase together with the land and was described as a part thereof in the deed, which was recorded without objection; but no doubt through an oversight, without mention of the house. The indorsement on the deed, relied on by appellant, contains no intimation of such omission, but the fact must be determined from the contents of the record entry, regardless of what the recital in the indorsement may show. This house and the ground occupied by it appear to have been expressly excluded from the agreement of lease above mentioned, and hence the omission upon the record did not receive attention at that time. Appellant insists that the mistake on the part of the registrar in failing to mention the house on recording the deed to both house and land, should not prejudice the right of the owner to have the same placed on record; but as pointed out by the registrar, no request for the correction of this error was made and the entry, whether right or wrong, can not be altered upon the

sole basis of recitals contained in subsequent transfers of the property, but must stand until a proper demand and satisfactory showing as to the grounds for the proposed modification be made.

In conclusion, therefore, in accordance with the repeated decisions of this court above mentioned, and without departure from the doctrine therein announced, we are constrained to hold that the ruling appealed from, in so far as the same refers to the house and garage and in this regard imputes to the deed of April 24, 1920, anything more than the curable defect already mentioned on recording the previous agreement of lease dated April 15, 1919, must be reversed, with instructions to record the said conveyance pursuant to the provisions of section 4 of the Law of March 1, 1902, subject only to such curable defect; and that in so far as the refusal to record the house described as standing upon the property "B" is concerned, the said ruling should be affirmed.

*Reversed in part.*

Chief Justice Hernández and Justices Wolf, Del Toro and Aldrey concurred.